Timothy CATLETT (No. 86–208), Steven L. Webb (No. 86–295), Christopher D. Turner (No. 86–315), Levy Rouse (No. 86–392), Kelvin D. Smith (No. 86–393), Russell L. Overton (No. 86–421),

and

Clifton E. Yarborough (No. 86–505), Appellants,

v.

UNITED STATES, Appellee.

Nos. 86–208, 86–295, 86–315, 86–392, 86–393, 86–421 and 86–505.

District of Columbia Court of Appeals.

Argued Nov. 19, 1987.
Decided June 27, 1988.

1204

Frederick J. Sullivan, Bowie, Md., appointed by the court, for appellant Catlett.

Steven R. Kiersh, appointed by the court, with whom Karen L. Hochstein, Washington, D.C., was on the brief, for appellant Webb.

G. Godwin Oyewole, Alexandria, Va., appointed by the court, for appellant Turner.

Lillian A. McEwen, Washington, D.C., appointed by the court, for appellant Rouse.

Greta C. Van Susteren, Washington, D.C., appointed by the court, for appellant Smith.

Allan M. Palmer, Washington, D.C., appointed by the court, for appellant Overton.

Wendell C. Robinson, Washington, D.C., appointed by the court, for appellant Yarborough.

Jody Goodman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Michael W. Farrell, Helen M. Bollwerk, and Jerry M. Goren, Asst. U.S. Attys., were on the brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

PRYOR, Chief Judge:

These seven appellants were charged with kidnaping (D.C.Code § 22–2101 (1981)), armed robbery (D.C.Code §§ 22–2901 (1981), –3202 (1987 Supp.)), and two counts of first-degree murder while armed, felony murder (D.C.Code §§ 22–2401, –3202 (1987 Supp.)). Appellants were convicted by a jury, and appeal, citing numerous grounds as error. Finding none of their contentions persuasive, we accept the jury's verdicts but remand for resentencing consistent with this opinion.

These consolidated appeals arise from the kidnaping and brutal murder of Catherine Fuller on October 1, 1984. Mrs. Fuller, who lived only a few blocks from where the murder occurred, left home about 4:15 p.m. to go to the store. She placed the fifty dollars her husband had given her to make her purchases in a change purse, secreted in her inner garments. When David Fuller last saw his wife, she was wearing two gold chains around her neck, four rings on her left hand, and curlers in her hair. It was a rainy afternoon and she wore a raincoat and carried an umbrella.

At 4:00 p.m., at a park on the southeast corner of Eighth and H Streets, Northeast, a group of young men, including appellants Timothy Catlett, Russell Overton, Levy Rouse, Kelvin Smith, Christopher Turner, Steven Webb and Clifton Yarborough, along with Harry Bennett and Calvin Alston, gathered near a shelter.[1] About the time Catherine Fuller was approaching the intersection at Eighth and H, Overton and Rouse were talking about "getting paid," a street term for robbery. Calvin Alston suggested robbing someone getting off a bus, but Rouse rejected this idea, complaining that a bus passenger would be unlikely to carry enough money to distribute among the group. Alston's attention was drawn to Mrs. Fuller. He proposed that she be the robbery target, and appellants agreed. As Mrs. Fuller turned from H Street onto Eighth Street and approached the entrance to an alley that ran parallel to H Street, appellants divided into two groups; one group followed her, while the other moved to the Ninth Street entrance to the alley.

Mrs. Fuller was forced into the alley where Rouse, Alston, Bennett, Turner, and Smith punched and kicked her. Rouse struck Mrs. Fuller over the head with a wooden plank and she dropped to the ground. She was carried to a spot farther into the alley and placed in front of a garage where her ordeal continued, with Catlett, Overton, Smith, Turner, Webb, and Yarborough beating her while she screamed for help and struggled to get free.[2] During the course of this second stage of the beating, Mrs. Fuller's change purse was taken from her underclothes and Catlett and Yarborough struggled over it, the contents emptying onto the ground.

By this time, Mrs. Fuller had stopped struggling, and Rouse and Overton dragged her across the ground into the garage. Rouse removed a ring from her

---

1. Calvin Alston and Harry Bennett testified on behalf of the government after Alston pled guilty to second-degree murder and Bennett pled guilty to manslaughter and robbery.

2. There was some conflict in the testimony of the government's witnesses regarding exactly when each appellant joined in the beating. However, there was overwhelming evidence that each of them was involved at one time or another.

finger and gave it to a bystander. Mrs. Fuller's clothing was removed and while two people held her legs Rouse inserted a pipe eleven inches into her rectum.[3] The group departed, and Mrs. Fuller was abandoned in the garage where she died sometime before 6:00 p.m. Her severely injured, partially clad body was discovered by a street vendor in the garage next to the doorway, hidden from the view of anyone outside the garage. A medical examination revealed that she died of multiple blunt force injuries, a combination of the beatings and the insertion of the pipe.

## I

Appellant Yarborough contends that the trial court should have granted his motion to suppress his videotaped statement because his age, education, and experience with the criminal justice system were not considered by the trial court in its determination of whether he had voluntarily waived his *Miranda* rights.[4]

During the hearing on his motion to suppress this statement, the government's evidence established that on December 9, 1984, Yarborough was arrested at his home and transported to the homicide office where he was read his *Miranda* rights, and given a card explaining those rights to read to himself. Acknowledging that he understood his rights, he wrote "yes" next to each waiver question, and signed the card. Appellant spoke with the detective for approximately forty-five minutes before being moved to another location within the police station. Unhandcuffed, he described the events of October 1, 1984, but did not admit his involvement. When he agreed to videotape his statement, his *Miranda*

rights were reread to him, and his previously signed card was again shown to him. Yarborough then allowed the police to videotape his statement, which set forth his version of the events surrounding Mrs. Fuller's death.

At the suppression hearing, appellant's sole contention was that he had been physically and mentally coerced into making the statement. In an effort to demonstrate physical abuse, he submitted hospital records indicating treatment for a knee injury, and called a detective to the stand who, however, testified that he had neither threatened nor physically abused appellant at any time during the questioning.[5] Appellant did not testify, nor did he present evidence regarding his education or experience with the legal system.[6] The court denied the motion, noting that appellant's claims of physical and mental coercion were unsubstantiated by the evidence, and that the circumstances surrounding his statement demonstrated that the waiver was knowing and voluntary.

Appellant correctly observes that in this jurisdiction special protections have been afforded to juveniles in determining the voluntariness of a statement or confession. *See In re D.A.S.*, 391 A.2d 255, 258 (D.C. 1978). The reason becomes clear when the juvenile system, as compared to the adult criminal system, is analyzed.

The juvenile justice system is based upon a theory of *"parens patriae,"* with the goal being to assist and rehabilitate the child rather than to punish him. Historically, this paternal orientation led to the absence of many procedural rights accorded adults. The Supreme Court, in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d

---

3. There was conflict in the testimony as to the identity of the person who held Mrs. Fuller's legs while Rouse inserted the pipe. One eyewitness testified that Alston and Webb held her legs; another testified that Overton assisted in holding her legs and a third testified that Overton alone held them.

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The government presented ample evidence that the injury was not inflicted by the police, and the trial court credited that evidence. Upon review of the record, we accept the trial court's findings on this issue.

6. In his written motion to suppress, appellant merely alleged, without supporting evidence, that he was poorly educated and had no experience with the legal system.

527 (1967), recognized these deficiencies and extended a minimum of rights to juveniles charged with delinquent behavior, including the rights to confrontation and cross-examination, as well as the privilege against self-incrimination. *Id.* at 34–57, 87 S.Ct. at 1447–59. However, substantial differences remain between the adult and juvenile systems. Among other things, juveniles are not entitled to a grand jury proceeding, jury trial, or bail.

■ In 1970, Congress enacted the District of Columbia Court Reorganization Act, substantially altering Juvenile Court practice. This Act partly amended § 16–2301 of the D.C. Code, changing the definition of "child" and thereby altering the scope of Family Division jurisdiction. *See Pendergrast v. United States,* 332 A.2d 919, 923 (D.C.1975).[7] In cases governed by this section of the Code, once the United States Attorney charges an individual with one of the enumerated crimes, the individual is properly presented to the Criminal Division, and from that juncture, Family Division jurisdiction is terminated. *See In re C.S.,* 384 A.2d 407, 411 (D.C. 1977).[8]

Transfer of a juvenile to criminal court is permitted as well by D.C.Code § 16–2307 (1981), when an individual fifteen years of age or older is alleged to have committed a crime which would constitute a felony if committed by an adult. This section requires "a judicial determination of suitability for adult treatment, whereas § 16–2301(3)(A) is an effective legislative determination of such suitability." *Id.* In either instance, the Family Division relinquishes jurisdiction. *Id.* Thus, when an individual, as here, is presented to the

Criminal Division of the court, pursuant to the charging discretion allowed the prosecutor by statute, the court does not act in a *"parens patriae"* role as in the Family Division, but correspondingly, the accused receives the full panoply of protections available in adult court.

In both juvenile and criminal court, whenever the voluntariness of a waiver of *Miranda* rights is called into question, the government must prove, by a preponderance of the evidence, that the confession or statement is voluntary. *Rogers v. United States,* 483 A.2d 277, 286 (D.C.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985) (citing *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972)). The trial court's conclusion that a statement was voluntary will be upheld when it is substantially supported by the evidence. *Taylor v. United States,* 380 A.2d 989, 992 (D.C.1977). In deciding whether a suspect voluntarily waived his *Miranda* rights, this court must consider the totality of circumstances surrounding the confession. *See Beasley v. United States,* 512 A.2d 1007, 1013 (D.C. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2485, 96 L.Ed.2d 377 (1987). The factors to be considered under the totality of circumstances in criminal court include "the defendant's prior experience with the legal system, the circumstances of the questioning, evidence of coercion or trickery resulting in a confession, and any delay between arrest and confession." *Id.* (quoting *Bliss v. United States,* 445 A.2d 625, 631 (D.C.), *amended,* 452 A.2d 172 (1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed. 2d 972 (1983), citing *Rosser v. United States,* 313 A.2d 876 (D.C.1974)).[9]

■ This list, however, is not exhaustive. It is well established that other important

7. Section 16–2301 (1981), states in pertinent part:

(3) The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—

(A) charged by the United States attorney with (i) murder, forcible rape, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense....

8. Yarborough was brought to criminal court and tried as an adult in this case under the authority of § 16–2301.

9. Although the government does not argue that juveniles tried in adult court should receive adult consideration with respect to the voluntariness of their confession or statement, they do correctly point out that the criteria applied to juveniles are not substantially different from those applied to adults. The major distinction

factors may be considered by the trial court in determining voluntariness, including the suspect's age and level of education. *Id.* Therefore, we conclude that when, as here, a juvenile is tried as an adult, a determination of voluntariness should include the totality of relevant factors. Applying this approach, it will be a proper exercise of the rights of the accused to bring to the court's attention particular factors which are deemed significant, including the person's age, education, and experience with the court system.[10]

■ In the case before us, appellant presented no evidence regarding either his educational level or juvenile record. We hold, therefore, that the court properly based its decision upon the important factors brought to its attention. Under the totality of the circumstances, the trial court's conclusion had substantial support in the evidence.

## II

A number of appellants contend the trial court erred in denying their motions to sever. We address each of these contentions separately.

Appellants do not dispute that they were properly joined for trial under Super.Ct. Crim.R. 8(b). Our review of the trial court's refusal to grant the severance motions is limited to a determination of whether the broad discretion entrusted to the trial court was abused. *Sweet v. United States,* 438 A.2d 447, 450 (D.C.1981) (cita-

tions omitted). In doing so, we are unpersuaded that appellants suffered the level of prejudice necessary to warrant reversal. *See Payne v. United States,* 516 A.2d 484, 489 (D.C.1986).

■ Appellants Webb and Turner maintain that severance was required because the disparity in weight of evidence against their codefendants led the jury to a finding of guilt by association. We disagree. Disparity of the evidence may pose a risk of prejudice requiring reversal, but only where "the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants." *Sweet v. United States, supra,* 438 A.2d at 451 (quoting *Christian v. United States,* 394 A.2d 1, 21 (1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979)).

■ Although appellants' codefendants, particularly codefendant Rouse, may have taken a more active role in the incident, there was ample evidence of Webb's and Turner's participation in the crime. Several witnesses testified that both men beat Mrs. Fuller. In fact, Harry Bennett stated that Webb was one of the individuals holding Mrs. Fuller's legs while Rouse inserted the pipe. Detective Villars overheard a conversation at the jail between Turner and Overton in which Turner reassured Overton that they would not be charged for the crime, reasoning that they had not touched the body and had therefore not left fingerprints.[11] Where the evidence against one defendant is greater than that against the

lies in the closer scrutiny given to the circumstances surrounding juveniles' statements, and the increased importance placed upon their age and experience. *Compare In re F.D.P.,* 352 A.2d 378, 380 (D.C.1976) (special care must be taken with juvenile confessions); *Taylor v. United States, supra,* 380 A.2d at 992 n. 6 (juvenile's age is one of factors which should weigh heavily in a consideration of the totality of the circumstances surrounding confession) *with Beasley v. United States, supra,* 512 A.2d at 1013 (in addition to well-established factors considered in determining voluntariness of adult confession, court may also consider suspect's age, level of education, illness, injuries, and the influence of drugs or alcohol).

10. The same analysis applies when a suspect contests the voluntariness of the confession or statement itself, rather than the validity of the waiver. *See Beasley, supra,* 512 A.2d at 1015.

11. Appellants complain that the testimony of two of the government's witnesses, Harry Bennett and Calvin Alston, should have been found to be incredible, because both men were accomplices, pled guilty and testified for the government. We disagree. It is well established that "[a] conviction may rest solely on the uncorroborated testimony of an accomplice in this jurisdiction." *Price v. United States,* 531 A.2d 984, 986 (D.C.1987) (quoting *Mathis v. United States,* 513 A.2d 1344, 1350 (D.C.1986)). When such

other, severance is not required if the evidence against the latter is substantial and compelling. *Sweet, supra,* 438 A.2d at 452 (citing *United States v. Leonard,* 161 U.S. App.D.C. 36, 47, 494 F.2d 955, 966 (1974)). In the instant case, the evidence against appellants Webb and Turner demonstrated their complicity well beyond a *de minimis* role. We conclude that the disparity in evidence did not result in a finding of guilt by association, and severance was properly denied.[12]

■ Alternatively, appellant Turner argues that the joint trial of so many codefendants led the jury to confuse and cumulate the evidence, preventing them from following the trial court's limiting instructions. *See Payne, supra,* 516 A.2d at 490.

The prosecution and defense took great pains throughout trial to segregate the evidence. Moreover, the trial court constantly and meticulously guarded against confusion of the evidence by the jury, repeatedly instructing them to consider the evidence separately as to each defendant. That admonition was included in the court's final charge to the jury. The jury's ability to separate the evidence and follow the court's limiting instructions is evidenced by their verdict; two defendants were acquitted and two verdicts, including that against appellant Turner, were delivered after the others. *See Sweet, supra,* 438 A.2d at 452.

Citing *Rhone v. United States,* 125 U.S. App.D.C. 47, 365 F.2d 980 (1966), appellants Catlett and Yarborough contend that they were manifestly prejudiced by the trial court's refusal to grant their severance motions. *Rhone* specifies three sources of prejudice which could require severance. The first is defined as "where one defendant makes an inculpatory statement inadmissible against his codefendant...." *Id.* at 48, 365 F.2d at 981. The second occurs where codefendants present irreconcilable defenses, and the final source is when some defendants testify while others remain silent, causing the jury to draw an adverse inference from their failure to testify. *Id.* However, neither appellant has demonstrated the requisite prejudice under the *Rhone* criteria. Upon review of the record, we find no basis for reversal.

■ In a similar vein, Catlett contends that, because he chose to proceed without a defense he was prejudiced by rebuttal testimony offered against his codefendants. This claim, too, is unpersuasive.[13] Indeed, his trial counsel acquiesced in the rebuttal testimony, agreeing that the testimony of two witnesses placing Catlett near the alley after the murder with a large group of people was essentially harmless. Given the broad discretion accorded a trial judge in determining the propriety of rebuttal evidence, *Fitzhugh v. United States,* 415 A.2d 548, 551 (D.C.1980) (citing *Gregory v. United States,* 393 A.2d 132, 137 (D.C.1978)), we agree with counsel's own admission, and find his contrary contention on appeal unpersuasive. *See Carter v. United States,* 475 A.2d 1118, 1125 n. 2 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985).

### III

■ Appellants Smith, Catlett and Rouse contend that their trials should have been

---

testimony is elicited, it is the usual practice for a cautionary instruction to be issued by the trial court. *Id.* In this case, not only was the instruction issued, but the testimony of the accomplices was corroborated by testimony from other government witnesses.

**12.** Appellant Webb also claims that he was manifestly prejudiced because Rouse, on cross-examination by the government, went down the line, pointed to each defendant and explained how he knew each one. This argument is groundless, and we therefore decline to address it further.

**13.** We likewise find no merit to appellant Catlett's missing witness argument. During the trial, counsel chose to neither interview nor call to the stand one witness about whom he now complains, and for whom he had the address. Furthermore, it was unlikely that any of these witnesses could have elucidated the transaction. *See Lawson v. United States,* 514 A.2d 787, 789 (D.C.1986). Therefore, we do not fully address the arguments raised.

severed because of the admission into evidence, in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), of appellant Yarborough's redacted videotaped statement. Although Yarborough did not testify, we do not find that the admission at trial of his statement prejudiced appellants, making the denial of their motions to sever reversible error.[14]

The statement was twice redacted by the government before the trial court was satisfied that it did not implicate any of the codefendants. All references to the names of participants in the crime were deleted from the videotape by erasing the relevant audio portions and superimposing a mask over Yarborough's mouth at the proper times so that the jury would be unable to read his lips. On the transcript of the tape, which was provided to the jury only while the videotape was being played in the courtroom, blanks were inserted wherever Yarborough had identified a participant by name. Nor were any of the codefendants described or identified in any other way by Yarborough.

*Bruton, supra,* held that it was a violation of a defendant's Sixth Amendment right to confront the witnesses against him to allow into evidence, at a joint trial, an extrajudicial statement of a nontestifying codefendant which implicates the defendant. 391 U.S. at 135–37, 88 S.Ct. at 1627–28. However, before granting a motion to sever on *Bruton* grounds, the trial court should consider whether redaction, *i.e.*, editing the statement to delete references to

the nonconfessing defendant, is feasible. *West v. United States*, 499 A.2d 860 (D.C. 1985) (citing *Carpenter v. United States*, 430 A.2d 496, 501 (D.C.) (en banc), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981)). Redaction is a feasible alternative "whether or not the codefendant takes the stand and testifies." *Carpenter v. United States, supra,* 430 A.2d at 504. "[W]here redaction is feasible, severance may properly be denied." *Id.* at 501.

The proper redaction of the confession, as well as the judge's instructions to the jury, insulated appellants Smith and Catlett from prejudice. Indeed, not only did a large group of people participate in the crime, but it was also established at trial that numerous bystanders watched the violent acts being committed. We hold that the statement was properly redacted under *Bruton,* and did not prejudice either appellant.

We acknowledge that the question is more difficult with respect to appellant Rouse.[15] The references by Yarborough to the act of inserting the pipe, albeit without mentioning names, may have more strongly implicated Rouse than his codefendants, especially in light of the government's evidence which expressly identified Rouse alone as the perpetrator of this particular act. However, we are not persuaded that the statement rises to the level of a *Bruton* violation in this jurisdiction.

We are mindful of diverse opinions rendered by a number of federal appellate courts addressing the question posed when

---

14. Appellants Smith and Catlett also contend that the redaction was ineffective because the multiple blanks which replaced the names of the participants could have been substituted for the names of those participants, thereby allowing the jury to correspond each blank to an individual. This argument has no factual basis. Even assuming that the jury would have attempted to match names with blanks in the statement, a review of the statement demonstrates that the number of blanks well exceeded the number of participants named at trial. We therefore find no merit to this contention.

15. Rouse also raises an unpersuasive contention regarding the competency of government witness Carrie Eleby to testify. Contrary to his assertions, it is clear from a review of the record that Ms. Eleby's memory was not faulty, nor did she have trouble remembering the birthdates of her children, appellant's chief objection to her testimony. The trial judge perceived no problem with her competency, and the record is consistent with his perception. *See In re B.D.T.*, 435 A.2d 378, 379 (D.C.1981). Therefore, the trial court did not abuse its discretion when it allowed the witness to testify notwithstanding counsel's objections. *Id.* (citations omitted).

the prosecution offers a confession obtained from a nontestifying codefendant, and objection is raised on the ground that admission of the confession in the context of surrounding evidence will cause the jury to draw inferences of guilt against a nonconfessing defendant even though that defendant is not named or otherwise directly implicated. The Supreme Court reviewed, but did not resolve this issue, often referred to as contextual analysis or contextual implication, in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987);[16] *see also Marsh v. Richardson*, 781 F.2d 1201 (6th Cir.1986).

Given the nature of the evidence presented in this case, we need not formulate the boundaries of this concept. Thus, we neither adopt nor reject it. As noted, the redaction was carefully implemented. A large group of people was involved in the crime. Rouse was not materially prejudiced by the statement attributed to Yarborough given all the other powerful evidence against him. The trial court twice instructed the jury that the statement was to be considered only as to codefendant Yarborough, and that they should not assume that the deletions referred to any other codefendant. This instruction was given once before the videotape was played, and again during final instructions. The jury is presumed to have followed the instructions. Thus, whether the question is viewed under *Bruton* or through a contextual analysis prism, we conclude the court did not err in denying severance. Even assuming, arguendo, some error in the latter respect, the error was harmless

beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## IV

Several appellants contend that the trial court should have excused a juror accused of misconduct and proceeded to a verdict with eleven jurors.[17] This claim stems from an accusation of misconduct brought against a juror by sixteen-year-old Darnella Perritt, who claimed to know both the juror and the juror's daughter. Perritt accused the juror of watching television news reports about the trial; having knowledge of an alleged friendship between her daughter and several of the defendants; and claimed to have overheard the juror tell her daughter that all her "boyfriends" were going to jail.

Immediately following Perritt's accusations, the trial court held a hearing on the issue. The trial judge heard testimony from both the juror and her daughter and credited their testimony, finding on the basis of this extensive *voir dire* that no misconduct had occurred. He further found Perritt's accusations wholly incredible and her testimony unbelievable.[18]

Following the hearing, Judge Scott denied appellant Smith's motion for a mistrial, and reserved ruling on whether the juror could continue to serve on the jury. The following morning the court again questioned the juror to determine whether she could remain fair and impartial. Thereafter, the court conducted a *voir dire* of four jurors who had overheard part of a

---

16. In *Richardson v. Marsh, supra,* the Court held that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when the confession is redacted to eliminate not only the defendant's name, but any reference to the defendant's existence.

17. At trial, the trial court was confronted with divergent opinions as to the course of action the trial court should adopt with respect to the accusation of misconduct. Several defendants requested that the juror be removed from the jury, and in the alternative moved for a mistrial. Others moved only for a mistrial, while two

defendants moved for a mistrial but expressly objected to excusing the juror and proceeding with a jury of eleven.

18. Indeed, Perritt's testimony was replete with discrepancies and inconsistencies. Her bias was demonstrated by her testimony that she had been in court every day of trial, had visited appellant Rouse in jail the day before her accusation, and had sent pictures of herself to appellant Catlett during trial. At the close of the hearing, Perritt asked Judge Scott, "Is my name and stuff going to be in the paper?"

newsflash, and one who had overheard two people on the subway mention the incident. After extensive argument on the issue, the court noted that the jurors had conscientiously notified the court regarding overheard references to the incident, and ruled that the jurors who had overheard statements referring to the incident were untainted.[19] All motions for a mistrial were denied and the juror was permitted to continue deliberations. Later that day, over the objection of appellant Yarborough, the court ordered the jury sequestered for the remainder of the deliberations.[20]

Appellants Catlett, Overton, Turner, Webb, and Yarborough claim that the juror should have been excused from further deliberations while appellants Rouse, Smith, and Catlett, in the alternative, argue that the court should have declared a mistrial. Because we hold that the trial court did not abuse its discretion in failing to excuse the juror, we do not reach the question whether the trial could have proceeded with a panel of eleven jurors.[21]

The trial court has broad discretion in deciding whether to excuse a juror for just cause, and will be reversed only upon a showing of abuse of that discretion. *See Welch v. United States*, 466 A.2d 829, 836 (D.C.1983); *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). Moreover, the trial court has

sound discretion in evaluating a juror's impartiality, for demeanor plays an important role in that decision. *Rease v. United States*, 403 A.2d 322, 325 (D.C.1979) (citations omitted). Determinations of impartiality may properly be made at a hearing where the defendant has the opportunity to prove actual bias. *Smith v. Phillips*, 455 U.S. 209, 215, 217, 102 S.Ct. 940, 945, 946, 71 L.Ed.2d 78 (1982); *see also Brooks v. United States*, 536 A.2d 1091, 1096 (D.C. 1988).

 The trial court not only held hearings to determine whether misconduct had occurred, but also held a subsequent hearing to determine whether the accused juror and other jurors who had heard of the incident could remain impartial. During this hearing, the court invited questions from defense counsel regarding the issue of impartiality. At the end of the hearing, the court determined that the jurors could render fair and impartial verdicts. The finding of the trial court, that under the circumstances the jurors could be impartial, was proper.[22]

Alternatively, appellants Smith, Rouse, and Catlett contend that the trial court should have granted a mistrial. Again, we are unpersuaded. The trial judge has equally broad discretion in deciding whether to grant a mistrial. *Carter v. United States*, 497 A.2d 438, 441 (D.C.1985). Fur-

---

19. In fact, the trial transcript reflects several instances of conscientious jurors informing the court of even the most minor contact with publicity or the public regarding the trial.

20. Appellants Catlett, Smith, Rouse, and Yarborough contend that the trial court erred in sequestering the jury at this juncture. However, there is no evidence that the sequestration coerced the jury's verdict. *See Chavarria v. United States*, 505 A.2d 59, 64 (D.C.1986); *Morton v. United States*, 415 A.2d 800, 802 (D.C. 1980).

21. Super.Ct.Crim.R. 23(b), as amended in 1985, permits the return of a verdict by fewer than twelve jurors when all parties so stipulate, or the return of a verdict of eleven jurors over a party's objection if the court finds "just cause"

for dismissal of the twelfth juror. We do not have such a situation here, and decline to speculate regarding the appropriateness of such an action had the trial judge chosen to take this course.

22. Appellants Smith and Catlett also argue that the trial court should have heard testimony from additional witnesses before concluding that the juror had not engaged in misconduct. As the only witnesses to the accusations were those who appeared at the hearing, we find this argument groundless. Moreover, we also disagree with the assertion that a juror's testimony is inherently suspect. The Supreme Court has dispelled any such notion in *Smith v. Phillips, supra,* 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7.

thermore, where as here, at least one defendant objects to a mistrial,[23] the trial court must find "manifest necessity" before taking such a drastic measure. *Id.* (citing *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978)). The trial court acted properly when under the circumstances it refused to declare a mistrial.

 In a related argument, appellants argue that in light of the pre-trial and trial publicity, the trial court should have sequestered the jury at the beginning of trial.[24] The decision to sequester a jury lies within the discretion of the trial judge. *See Baker v. United States,* 131 U.S.App. D.C. 7, 17, 401 F.2d 958, 968 (1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed. 2d 384 (1970). Moreover, a trial court's decision regarding sequestration will not be overturned absent an affirmative showing of prejudice. *Wheeler v. United States,* 82 U.S.App.D.C. 363, 367, 165 F.2d 225, 229 (1947), *cert. denied,* 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1948) (citing *Brown v. United States,* 69 U.S.App.D.C. 96, 99 F.2d 131 (1938)). It is axiomatic that the right to a fair trial by an impartial jury is not

defeated merely because the requested remedy is not granted. Rather, other measures may be employed to ensure a fair trial. *See Welch v. United States, supra,* 466 A.2d at 834–35.[25] As this case was one of community interest, a measure of publicity surrounded the trial proceedings. However, there is no evidence that the safeguards adopted by the trial court inadequately insulated the jury from publicity, particularly in light of the extensive juror *voir dire.* Our inquiry, therefore, turns on the adequacy of that *voir dire. Id.* at 835.[26]

The effectiveness of the *voir dire* is judged by whether the nature and strength of the opinion formed by the juror raises a presumption of partiality, regardless of (1) whether the juror has been exposed to the facts and issues of the case, or (2) whether an opinion as to the guilt or innocence of the accused has been formed. *Id.* at 836. So long as the juror asserts that he or she is able to set aside his or her impressions and render a verdict based on the evidence presented in court, and the court assures itself that this assertion is valid, the standard is satisfied. *Id.* The trial court is deemed competent to make this determina-

---

**23.** A review of the record reveals that at least one defendant objected to a mistrial. Moreover, the record is unclear as to the desires of two other defendants who did not voice an opinion regarding this matter.

**24.** Although appellant Catlett claims that he moved for sequestration, he does not cite a record reference. We find no evidence that such a motion was made, and thus his claim should be viewed under the plain error standard. In any event, we are not persuaded by appellants' claims in this matter, and thus the standard of review is immaterial.

**25.** We briefly address the question of the effectiveness of the trial court in minimizing the impact of publicity on the jurors during trial. We find the trial court's efforts in this area exemplary, and appellants' contentions groundless. The trial court conscientiously and consistently instructed the jury not to read news items, listen to radio news, watch television news, or speak about the trial. The jury demonstrated its understanding of this responsibility by bringing even the slightest contact to the attention of the trial court. Upon receiving

word of contact, the trial court questioned the juror with regard to what he or she had heard or seen, until satisfied that the juror could remain impartial. Indeed, after each incident defense counsel expressed satisfaction with the trial court's efforts. Moreover, none of the appellants moved for sequestration after the trial had begun.

**26.** *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), typifies an "extreme circumstance." In that case, a twenty minute "interview" with the defendant, during which he confessed to the charges against him, was televised three times in a town with a population of 150,000 from which the jury was drawn. In the District of Columbia, there is a strong presumption that jurors can be empanelled whose exposure to the case will have been sufficiently minimal for them to render a fair and impartial verdict. *Welch, supra,* 466 A.2d at 836 (citing *United States v. Edwards,* 430 A.2d 1321, 1345 (D.C.1981) (en banc), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982)).

tion of impartiality.[26a] *See Rease v. United States, supra,* 403 A.2d at 325–26.

In this case, the *voir dire* preceding appellants' trial was properly conducted. The process extended over a period of five days and constituted more than eight hundred pages of transcript. Each prospective juror was exhaustively questioned in a separate room regarding his or her knowledge of the case, and whether any formed opinion could be set aside and a fair and impartial verdict rendered. The court excused a number of prospective jurors based upon exposure to publicity. Each empanelled juror stated that he or she had not formed an opinion about the defendants' guilt, and each had heard and read only superficial news reports about the case. This extensive and careful *voir dire* procedure, which has not been challenged on appeal, ensured that appellants Catlett, Rouse, and Smith were not prejudiced by the pretrial publicity.[27]

## V

Appellants Catlett, Overton, Smith, Rouse, and Webb contend that the trial court should have granted their motions for judgment of acquittal on the kidnaping counts because their asportation of Mrs. Fuller was an integral part of the robbery rather than a separate offense, and thus merged into the crime. We disagree.

While not every robbery gives rise to responsibility for kidnaping, kidnaping does not necessarily merge into robbery when committed during closely related incidents. When the detention or confinement is an integral part of the robbery, the two will merge, and only a robbery conviction will stand. *Robinson v. United States,* 501 A.2d 1273, 1276–77 (D.C.1985) (citing *Sinclair v. United States,* 388 A.2d 1201, 1204 (D.C.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979)).[28] However, where a jury could reasonably conclude that the detention or confinement was not "approximately coextensive" in time and place with the crime itself, then each may constitute a separate criminal act. *Sinclair v. United States, supra,* 388 A.2d at 1204.[29]

There was ample evidence from which the jury could find that appellants "seized," "confined," or "carried away" with the intent to "hold" or "detain," in order to successfully complete the robbery. The victim was forced from a busy intersection into an alley, where she was beaten and prevented from escaping. Eventually, she was forced one hundred and sixty feet farther into the

---

**26a.** In a supplemental brief filed the day before oral argument, appellant Turner contested the manner in which the trial court conducted its allocation of peremptory challenges during jury selection. Upon review of appellant's argument, it is not entirely clear that the facts are as he contends. Moreover, as his assertions do not rise to the level of reversible error, we decline to further address the issue.

**27.** Appellant Yarborough contends that he was entitled to a change of venue to suburban Maryland or Virginia due to prejudicial pretrial publicity. In light of the well-established rule in this jurisdiction that because the District of Columbia Superior Court sits as a unitary judicial district, a change of venue is not an available option in the District; appellant's claim is groundless. *United States v. Edwards, supra,* 430 A.2d at 1345.

**28.** Kidnaping is defined under D.C.Code § 22–2101 (1981), as:
seizing, confining, inveigling, enticing, decoying, kidnaping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise....

The "heart of the crime" of kidnaping is seizure and detention against the victim's will. *See Beck v. United States,* 402 A.2d 418, 423 (D.C. 1979). Robbery, D.C.Code § 22–2901 (1981), is defined as the taking of any item of value from the person or immediate actual possession of another "by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear...."

**29.** Appellant Catlett's claim that the evidence was insufficient to support his conviction because the victim was not transported subsequent to the robbery is groundless. Asportation is not an essential element of the kidnaping statute. *Khaalis v. United States,* 408 A.2d 313, 362 (D.C. 1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980).

alley where the beating resumed. Once the group reached the middle of the alley, appellant Catlett searched Mrs. Fuller for valuables before dragging her into the nearby garage. In the enclosure of the garage, she was stripped of her clothing and more of her belongings before, after further beating, the pipe was thrust into her rectum.

■ Appellants' actions in forcing Mrs. Fuller into the alley, away from the street where bystanders may have seen and interfered, both exposed the victim to more danger and decreased the risk that appellants would be caught. *See Beck v. United States, supra,* 402 A.2d at 423; *Sinclair, supra,* 388 A.2d at 1207. This forcible detention, which began before and continued after the victim's valuables were forcibly removed, "cannot be deemed a detention approximately coextensive or a necessary incident to the crime of robbery." *Sinclair, supra,* 388 A.2d at 1208. Thus, the evidence was sufficient to convict appellants of both crimes, and these convictions must stand.[30]

■ In a related argument, appellant Catlett contends that he was entitled to a jury instruction on the lesser-included offense of robbery, because the jury could reasonably have concluded that his part in the robbery ended before Rouse assaulted Mrs. Fuller with the pipe. He also argues that he had withdrawn from the robbery at that time, pointing to one witness' testimony that he yelled "stop" as Rouse was inserting the pipe. We are unpersuaded by either argument. First, we hold that the trial court did not err in declining to grant a jury instruction on the lesser-included offense of robbery where there was no

sufficient evidentiary basis for the lesser-included charge. *See Lampkins v. United States,* 515 A.2d 428, 432 (D.C.1986). It is clear from a review of the record that for the jury to convict on the charge of robbery it would have been forced to undergo an "irrational or bizarre reconstruction of the facts of the case." *Anderson v. United States,* 490 A.2d 1127, 1130 (D.C.1985). Where such mental gymnastics are required, no lesser-included offense instruction may be given. *Id.* Therefore, the trial court properly refused the instruction.

Contrary to appellant's argument, the evidence does not suggest that he attempted to withdraw from the armed robbery merely by yelling "stop." This testimony was counteracted by the statement of another eyewitness who testified that he overheard Catlett telling another man that Mrs. Fuller had to be killed because she recognized one of her assailants. Moreover, under an aiding and abetting theory, it is well established in this jurisdiction that appellant need not have "intended the particular crime which was committed by the principal in order to be liable for what occurred." *Johnson v. United States,* 434 A.2d 415, 422 (D.C.1981) (citing *Hackney v. United States,* 389 A.2d 1336, 1342 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979)).

## VI

■ Appellant Overton's primary argument is that the government violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to disclose to the defense a witness who would testify that he knew, but did not see appellant in the alley during the crime.

Overton filed a *Brady* request demanding "the name and address of all eye-

---

30. Appellant Smith contends that even if the kidnaping is found to be an offense separate from the robbery, the evidence was insufficient to establish his participation in the former crime. We disagree. Under D.C.Code § 22–105 (1981), Smith's role as an aider and abettor sufficiently imputes to him guilt for the act of kidnaping. *See Murchison v. United States,* 486 A.2d 77, 81 (D.C.1984). Although mere presence at the scene of a crime is seldom sufficient to

prove that an individual acted as an aider or abettor, "[p]resence is ... equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed ... or where it stimulates others to render assistance to the criminal act." *Settles v. United States,* 522 A.2d 348, 357 (D.C.1987) (quoting *Bailey v. United States,* 135 U.S.App. D.C. 95, 98–99, 416 F.2d 1110, 1113–14 (1969) (footnotes omitted)).

witnesses to the crime who failed to identify Russell Overton as participating therein." The trial court ruled that those names did not constitute exculpatory evidence under *Brady*, and denied the request. The court did, however, state that the prosecutor should release to the defense the names of any eyewitnesses who knew Overton before the crime and failed to identify Overton as a participant. Later, Judge Scott expounded upon his earlier ruling, but it is unclear from the record whether that ruling was withdrawn or merely reiterated.[31] In any event, we are not persuaded that the nondisclosure of the government witness violated *Brady*.

*Brady* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment...." 373 U.S. at 87, 83 S.Ct. at 1196–97. This standard was later clarified in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), where the Supreme Court explained, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 S.Ct. at 3383. Moreover, when the defendant receives the information in time to use it at trial, there is no *Brady* violation. *Lewis v. United States*, 393 A.2d 109, 114 (D.C.1978), *aff'd after reh'g*, 408 A.2d 303 (D.C.1979) (quoted in *Coleman v. United States*, 515 A.2d 439, 446 n. 9 (D.C.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987)). In light of these holdings, appellant's claim must fail.

Appellant contends that had he known of the witness' existence, he would not have presented his discredited alibi defense. Appellant, however, became aware of the witness' existence in plenty of time to use it fully to his benefit, and did in fact do so. During cross-examination of this particular government witness, he emphasized that although the witness knew Overton and was aware of his exceptional height, he did not see him in the alley. Furthermore, during closing argument, Overton's counsel focused on the witness' failure to place Overton at the scene of the crime, suggesting that this circumstance corroborated his alibi defense.

Overton neither objected nor brought to the trial court's attention any mention of a possible "dilemma" brought about by the witness' testimony. With the benefit of hindsight, appellant now attempts to persuade this court that his choice of strategy harmed him, and should be rectified on appeal. However, Overton ignores the testimony of four other government witnesses, all of whom placed him at the scene of the crime, three of whom testified that he actively participated in the criminal acts. Indeed, at least one witness testified that Overton held Mrs. Fuller's legs while Rouse assaulted her with the pipe. It strains credulity, therefore, to assume in the face of overwhelming testimony against him, that appellant would have been satisfied to rely solely upon the somewhat neutral testimony of one government witness.[32] We are unpersuaded that the failure of the government to disclose the testimony of this one witness undermined confidence in the outcome of the trial. *Bagley, supra.*

## VII

■ Appellant Smith contends that the trial court improperly allowed a government rebuttal witness to testify regarding other crimes evidence inadmissible under *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and that his motion for mistrial should have been granted. The

---

31. Appellant's counsel was not present when the trial court, in response to a question from another defense attorney, sought to clarify its earlier ruling.

32. As stated above, a large group of people was present at the scene, and the fact that Thomas did not "see" Overton on the scene does not dispositively signify that he was not there.

dispute centered around the witness' testimony that while he was speaking with police about the murder, Smith watched his house from across the street, and remained standing there until the police were ready to leave. He further testified that he later noticed Smith standing in front of his school. Following objections from Smith, the trial court instructed the jury to disregard all of this testimony as irrelevant to the case. Appellant maintains that this testimony gave rise to the inference that he was committing another crime, namely obstruction of justice, and therefore, the mistrial should have been granted.

It is well settled in this jurisdiction that evidence of other criminal acts which are independent of the crimes charged, are inadmissible where they tend to prove a criminal disposition on the part of the accused. *Jones v. United States*, 477 A.2d 231, 237 (D.C.1984) (citing *Miles v. United States*, 374 A.2d 278, 282 (D.C.1977), *Drew v. United States, supra*, 118 U.S.App.D.C. at 15, 331 F.2d at 89). Although this proscription extends to acts which have not been formally adjudicated as criminal, it does not extend to acts which are not "minimally in the nature of a criminal offense." *Bigelow v. United States*, 498 A.2d 210, 212 (D.C. 1985) (quoting *Wheeler v. United States*, 470 A.2d 761, 769 (D.C.1983)). This rationale may be applied with equal strength to the facts before us. Here, the evidence that Smith stood on a corner, and later at a school, does not give rise to evidence of other crimes, and we do not agree that it is even minimally in the nature of the offense of obstruction of justice. Standing on a street corner or at a school, without more, does not rise to the level of wrongful conduct necessary to a *Drew* analysis. *See, e.g., Jones v. United States, supra,* 477 A.2d at 237–38. Appellant's rights were further safeguarded by the judge's instructions to the jury to disregard the testimony. *See Beynum v. United States*, 480 A.2d 698, 702 (D.C.1984).

### VIII

 Appellant Turner also contends on appeal that his cross-examination of a police detective during his motion to suppress photo identification was improperly curtailed by the trial judge, thereby inhibiting him from demonstrating the suggestivity and unreliability of his in-court identifications.

While we acknowledge that the right to cross-examination is inherent to the Sixth Amendment right to confrontation, "[the] extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Springer v. United States*, 388 A.2d 846, 854 (D.C.1978) (quoting *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)). It is always within the discretion of the trial court to prevent repetitive questioning, or inquiry into matters having little relevance or probative value. *Id.* at 844–45. Our review of the record reveals that appellant's counsel consistently made repetitive or irrelevant inquiries of the government's witness, and that the trial court was well within its discretion in preventing this unnecessary line of questioning. On the other hand, the trial court permitted appellant's counsel to inquire into all matters actually relevant to the issue at hand.

 Neither do we agree with appellant's argument that the testimony of the identifying witnesses, each of whom knew appellant personally, was "so inherently weak or unreliable as to lack probative value." *Sheffield v. United States*, 397 A.2d 963, 967 (D.C.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979). The court properly refused to suppress the identifications on the basis of appellant's claim that they were inherently incredible. *See In re A.H.B.*, 491 A.2d 490, 496 n. 8 (D.C.1985).

### IX

 Appellant Smith contends that his sentence must be modified. Although only appellant Smith raises this contention on appeal, our decision applies to all appellants, including those who have failed to

raise this issue before us. Appellants were convicted of first-degree felony murder (kidnaping), first-degree felony murder (armed robbery), kidnaping and armed robbery. The court imposed sentences of 20 years to life imprisonment on each of the felony murder convictions, to be served concurrently with one another and a sentence of 15 years to life imprisonment on both the kidnapping and armed robbery convictions, to be served concurrently with one another but consecutively to the felony murder convictions.[33] Where there is a merger of two or more crimes, the trial court is not required to elect, before appeal, a particular conviction on which to base its judgment. *Byrd v. United States,* 510 A.2d 1035, 1037 (D.C.1986) (en banc). We agree however, and the government concurs, that under existing case law, appellants cannot remain sentenced, either consecutively or concurrently, for both felony murder and the underlying felony. *Adams v. United States,* 502 A.2d 1011, 1026 & n. 22 (D.C.1986). *See also Garris v. United States,* 491 A.2d 511, 515 (D.C. 1985) (*Garris II*). Moreover, where, as here, "one killing is involved, and the government advances alternat[ive] theories of felony murder based upon more than one underlying felony, the accused may not be convicted of more than one felony murder." *Id.* at 1026 (quoting *Garris v. United States,* 465 A.2d 817, 823 (D.C.1983) (*Garris I*), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1013, 79 L.Ed.2d 243 (1984) (footnote omitted)).

Applying these rulings to the case before us, we remand to the sentencing court to vacate one felony murder conviction as well as the conviction for the predicate felony underlying the murder charge that is permitted to stand for each appellant, regardless of whether this issue was raised on appeal. This action, which would leave each appellant convicted of one count of felony murder and the noncorresponding felony would effectuate the trial court's original sentencing plan. *See Adams, supra,* 502 A.2d at 1027.

*So ordered.*

---

**33.** Appellant Turner was sentenced to 20 years to life for each felony murder count, to run concurrently, and 7½ years to life each for armed robbery and kidnaping, to run concurrently with each other and consecutively to the felony murder counts.