Derrie A. NELSON, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1219.

District of Columbia Court of Appeals.

Argued Sept. 26, 1989.
Decided Dec. 30, 1991.

---

Mindy A. Daniels, appointed by the court, for appellant.

Julieanne Himelstein, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, were on the brief, for appellee. R. Jeffrey Behm, Asst. U.S. Atty., also entered an appearance for appellee.

Before FERREN, TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Nelson was convicted of one count of felony murder while armed,[1] first-degree burglary while armed,[2] assault with intent to kill while armed,[3] kidnapping while armed,[4] and carrying a pistol without a license.[5] The jury acquitted him of armed robbery[6] and of a second count of felony murder while armed, as to which that

---

1. D.C.Code §§ 22–2401, 22–3202 (1989).

2. D.C.Code §§ 22–1801(a), 22–3202 (1989). This burglary was the felony which underlay the felony murder charge.

3. D.C.Code §§ 22–501, 22–3202 (1989).

4. D.C.Code §§ 22–2101, 22–3202 (1989).

5. D.C.Code § 22–3204 (1989).

6. D.C.Code §§ 22–2901, 22–3202 (1989).

robbery was the underlying felony. On appeal he presents ten separate assignments of error, of which one is conceded by the government (see note 33, *infra*) and eight more are without merit. As to the tenth, we hold that the trial court erred in failing to consider a pre-trial claim of ineffective assistance of counsel in the manner prescribed by *Monroe v. United States,* 389 A.2d 811 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States,* 391 A.2d 755 (D.C.1978). We therefore remand the case for further proceedings consistent with the *Monroe–Farrell* line of cases. If the *Monroe–Farrell* proceedings on remand result in a finding that appellant's Sixth Amendment right to the effective assistance of counsel was infringed, the trial court shall set aside his conviction and order a new trial. If the Sixth Amendment issue is resolved against appellant on remand, however, then the judgment of conviction shall stand affirmed.

## I

### A. *The Government's Evidence*

Leonard Kelly, the manager of a restaurant (Louie's) and the co-owner of another (the Nob Hill), owned a house in the 1100 block of Lamont Street, N.W. From time to time during the years he had lived in that house, Kelly had taken in a number of roomers. One of those roomers was appellant Nelson, who had been referred to him by an employee of the Nob Hill. Nelson rented a room on the second floor and moved in on December 1, 1984. However, when he failed to pay his rent, Kelly asked him to leave. Nelson moved out on the first weekend in January 1985, taking with him his set of house keys,[7] but leaving virtually all of his possessions behind except the clothes he was wearing. Kelly then placed Nelson's belongings in boxes and put them in the basement. A couple of weeks later, upon finding that some of the

clothing and other items had been removed in his absence, Kelly assumed that Nelson had returned to collect them.

Shortly after Nelson moved out, Kelly rented another room in the house to Robert Nichols, whom he had known for several years. Nichols' room was on the second floor of the house, at the rear. Kelly testified that Nichols and Nelson had never met, nor did Kelly ever mention to Nelson that Nichols had become a tenant in his home.

On February 12, 1985, Kelly left home at about 5:30 p.m. to go to work at Louie's. At the time he left, Nichols was the only other person in the house. At 11:45 p.m. that same evening, Kelly's next-door neighbor, Tami Battle, had just returned home from a date and was parked in front of her house, saying goodnight to her boy friend, when she saw a man wearing bib overalls, work boots, a rust-colored jacket, and something blue on his head walk up the street toward Kelly's house. The man paused briefly at the front door and then continued inside. Battle testified, in response to a specific question, that this man did not have to "force anything or break anything" to get in. Battle then entered her own home, where her brother Troy was baby-sitting with her child, and went upstairs to a bedroom where Troy and the baby were sleeping. As she stood in the bedroom, Battle heard noises through the wall between her house and Kelly's house [8] that "sounded like a fight." Troy Battle said that he also "heard some noises like something was happening exactly adjacent to my room, like somebody was being banged up against the wall ... and then I heard some muffled sounds, like somebody screaming or yelling ... but it was kind of muffled because it was through the wall." Both Tami and Troy Battle then heard two gunshots, and a few moments later Tami Battle heard the sound of someone running through the adjacent house. She immedi-

---

**7.** Each entrance to the house was protected by a security gate. Kelly had given Nelson two keys, one of which unlocked the front and back gates, and the other unlocked the front and back doors of the house itself.

**8.** The two houses were row houses, typical of the style found throughout the District of Columbia, with only a common wall between them.

ately went outside to her front porch, but Kelly's house was dark, and she saw nothing.

At approximately 2:30 a.m., Kelly drove home from work and parked his car in the garage. As he approached the back door of his house, he noticed that the rear gate, which had been locked when he left for work, was swinging open. Kelly was walking up the steps toward the back door when Nelson suddenly appeared and demanded to be let inside to pick up his belongings. Kelly told him to come back another time because it was too late in the evening, but Nelson refused to leave, pulled out a knife, and insisted that Kelly deliver his possessions.

Yielding to the threat of Nelson's knife, Kelly opened the back door, and the two men went inside. Immediately Kelly saw that a television set and a video cassette recorder (VCR) were missing from the sun room. Once inside, Nelson pulled out a gun and pointed it at Kelly's head, pulling the trigger twice. After the gun clicked but failed to fire, Nelson said to Kelly, "You think it's a toy, don't you?" Nelson pulled the trigger a third time, but still the gun did not fire. Again Nelson demanded his belongings, and Kelly responded that they were in the basement. Kelly then started toward the kitchen. As he turned, Nelson shot him in the back of the head, and Kelly fell to the floor. Nelson walked over and took Kelly's keys from his hand, then told him to stand up. Kelly, however, could feel blood running down the back of his neck and replied, "I can't get up." Despite Kelly's pleas, Nelson grabbed him by the arm and forced him to get up and go out to the garage.

When they reached the garage, Nelson ordered Kelly to lie face down on the floor.

Nelson then opened the trunk of Kelly's car and told Kelly to climb into it. Kelly stood up as if to do so, but instead he reached into the trunk, grabbed an umbrella, and hit Nelson on the side of the head. Kelly then fled down the alley behind his house, but Nelson caught up with him, and the two men resumed their fight. Kelly "got another swing" with the umbrella and started running again toward the Nob Hill restaurant, which was just a few doors away at the end of the alley. Nelson, however, caught up with Kelly outside the restaurant, slashed his face several times with the knife, and then picked up a cinder block and hit him once in the head with it.

Nelson fled when the manager of the Nob Hill, Ralph Smith, along with a bartender, came out of the restaurant. Smith, who had known both Nelson and Kelly for several years, testified that Nelson was wearing bib overalls and an orange "top" that night.[9] Lynette Edwards, another neighbor, also saw Nelson beating Kelly near the steps of the Nob Hill and then saw Nelson run away.[10] Kelly immediately telephoned the police, reporting the assault and naming Derrie Nelson as his assailant. He described Nelson as dressed in bib overalls, a red sweatshirt, and a dark knitted hat.

Officer Francis Nauheimer was the first to respond to the Nob Hill restaurant. Nauheimer spoke with Kelly and then went to Kelly's home nearby, where he found the garage open and, inside the garage, a car with an open trunk. Nauheimer returned to the Nob Hill and again spoke with Kelly. He then went back to the house and found Kelly's keys on a ledge inside the garage.

Circling to the front of the house, Officer Nauheimer, along with Officer Martin

9. Smith acknowledged that on a later date he was charged with second-degree murder in an unrelated case, but he denied that his testimony in this case was being given to obtain favorable treatment on the murder charge. On redirect examination Smith said that he had testified in the instant case before the grand jury in April 1985, more than eight months before the murder charge was brought against him. A transcript of Smith's grand jury testimony, which was consistent with his trial testimony, was introduced into evidence.

10. Later that night Edwards identified Nelson as Kelly's assailant from a photographic array which was shown to her at police headquarters. She was unable to identify him positively in court, but she did testify that the man whom she saw beating Leonard Kelly was wearing bib overalls and a rust-colored shirt.

Manfredi, opened the front door and went inside. Finding the first floor ransacked, the two officers headed upstairs. In the back bedroom on the second floor, Nauheimer found the body of Robert Nichols lying on his right side on the floor, with blood on his head and right hand. Next to his head was a pillow with what appeared to be a bullet hole in it. There was also a bullet hole in the floor. Nauheimer felt Nichols' body for a pulse, but found none.

Officer Manfredi testified that he spoke with Leonard Kelly at approximately 2:50 a.m. and that Kelly, who was bleeding from the back of the head, told him that his assailant was a former tenant named Derrie Nelson. Kelly described Nelson as wearing bib overalls and an orange or red shirt. Manfredi broadcast a lookout, giving both a description and Nelson's name, and then began searching for Nelson himself. At about 3:10 a.m. Manfredi spotted a man on Sherman Avenue, N.W., who matched Kelly's description as to height. Manfredi stopped this man, whom he identified in court as Nelson, and asked him to unzip his jacket. Nelson complied, revealing neither bib overalls nor an orange or red shirt. Without asking Nelson his name, Manfredi let him go.

Shortly thereafter Officer Robert Panizari stopped Nelson in front of 2824 Sherman Avenue, N.W., about four blocks from the 1100 block of Lamont Street. Although Nelson did not appear to fit the description given in the broadcast lookout, Panizari asked him his name. When he replied that his name was Derrie Anthony Nelson, Officer Panizari placed him under arrest.[11] Panizari "did a fast patdown," read him his rights, and called for a transport vehicle to take him back to Lamont Street, the scene of the crime. Officer Melvin Bellamy, the driver of the transport, conducted a full search and found a closed knife with blood on it in the pocket of Nelson's jacket. After they arrived at Lamont Street, Nelson told Officer Panizari that he had been playing cards all evening at a party with thirteen other persons.[12] He also said that he had moved out of Kelly's home three months earlier.

Nelson was next taken to the homicide office at police headquarters, where the processing officer, Detective Norman Brooks, noticed blood on Nelson's socks and shoes. Nelson explained that he had cut himself on both arms while at a party.[13] Brooks noted no cuts or lacerations on either of Nelson's arms, but he did detect some abrasions. After photographs were taken of Nelson's arms, Detective Brooks seized the shoes, socks, and jacket Nelson was wearing.

Nelson gave a statement to Detective John Clark in which he said that he lived in an apartment at 2217 First Street, N.W.. Later that same day, Detective Steele drove to that address to examine Nelson's car, supposedly parked outside the apartment. The car, described by Nelson as a 1973 red Pinto, was not there. Steele continued to drive by the apartment virtually every day until the car turned up ten days later, on February 23, in the alley behind the apartment. The occupant of the apartment was Ricardo Moore, who had initially recommended Nelson to Kelly as a prospective tenant. Nelson had stayed with Moore for a month after leaving Kelly's home in January. Moore testified that Nelson had moved out of his apartment and into one on Fairmont Street in early February, a few days before February 12. Timothy Frazier, a "good friend" of Nelson, testified that he had sublet an apartment at 1030 Fair-

11. Officer Panizari also noticed that the yellow shirt Nelson was wearing had been put on inside out.

12. In a statement he made to the police some time later, Nelson gave only partial names or nicknames for twelve of the thirteen persons supposedly at the card game. The one person whose complete name he provided, Keith Reid, testified at trial. Reid said that he was at home the entire evening of February 12 and that he never saw Nelson that night.

13. Detective George Steele questioned Nelson at approximately 6:35 a.m., shortly after Nelson was processed. In response to Steele's question about the blood on his shoes and socks, Nelson said that he had injected some heroin at a party earlier in the evening and that the blood had dripped onto his shoes and socks.

mont Street, N.W.,[14] to Nelson approximately one week before Nelson's arrest.

Dr. Michael Bray, a Deputy Medical Examiner, performed an autopsy on Nichols' body and determined that his death was the result of multiple gunshot wounds. In all, there were five bullet wounds to the body. One bullet had entered the left side of the chest and passed through the lung and heart; one had entered the abdomen; one had struck the back of Nichols' head near the base of the skull; one had entered the left side of the back just behind the left armpit and exited through the front of the chest; and one had grazed the middle finger of the left hand.[15] Dr. Bray testified that the wound entering the left side of the chest, by itself, would have been fatal within a few minutes. The wound entering the left side of the back was a contact wound, indicating that the gun had been placed against Nichols' body when it was fired. The autopsy also showed that the wound to the abdomen was most likely inflicted after death, when the assailant fired from a standing position into the body as it lay on the floor. Aside from this, however, it was impossible to determine the order in which the wounds were inflicted. Dr. Bray gave no estimate of the time of death.

Robert Hall, a special agent in the serology unit of the F.B.I. Laboratory, examined blood samples taken from Nelson's shoes and socks. The blood from the shoes was identified as human, but he could not discern further characteristics because of the small quantity of blood available for testing. The socks, however, were splattered with enough blood to identify characteristics compatible with either Kelly's or Nichols' blood, but excluding that of Nelson. Agent Hall also examined the knife recovered from Nelson. Hall was able to detect blood on the knife, but he could not determine whether the blood was human.

Special Agent Michael Malone, a hair and fiber expert with the F.B.I., examined hairs removed from the blue jeans and shirt worn by the decedent and concluded that these hairs microscopically matched sample hairs taken from Nelson. Malone also examined a hair found on Nelson's coat and determined that it matched that of Nichols. Finally, Malone compared and matched hairs taken from the cinder block with the head hairs of Kelly.

Kelly returned home on February 15 after a two-day stay in the hospital. An inventory of his home revealed that in addition to the television set and the VCR which he had initially found missing, a stereo, a ring, a watch, and two smaller television sets had also disappeared. In Nichols' room drawers were opened, items were strewn about the floor, and papers were scattered around the room. The room Nelson had occupied, however, was left undisturbed.

### B. *The Defense Evidence*

Nelson testified that he had met Kelly while working part-time as a disk jockey at the Nob Hill, which is a club for homosexuals. He said that his tenancy arrangement with Kelly did not include the payment of rent; Kelly had simply agreed to give him a place to stay. He lived in Kelly's house for a month and was asked to leave when he refused Kelly's sexual advances.

Contrary to his statement to the police, Nelson testified that at about 11:30 p.m. on February 12 Kelly telephoned him at his First Street apartment. Kelly asked him to come over to his house, but he would not explain why until he got there. Nelson said that when he left his First Street apartment he was wearing sneakers, a yellow shirt, black slacks, and a waistcoat. When he arrived at Kelly's house sometime between 2:30 and 3:00 a.m., he initially went to the front door but, seeing no one, went around to the back and rang the bell. Kelly opened the door, let him in, and then locked both the gate and the door.

Once inside, Nelson immediately saw that a plaid coat which belonged to him

---

14. 1030 Fairmont Street is approximately six blocks from Kelly's home on Lamont Street; 2217 First Street, however, is almost a mile from Kelly's home.

15. Dr. Bray characterized the finger injury as a "defensive wound." Such a wound occurs when the hand is raised in a defensive posture against a bullet fired toward the chest.

was lying across the back of a chair. He also noticed that the large television set near the back door was missing. He followed Kelly upstairs to the second floor, where he saw the body of a man he did not recognize lying on the floor of the back bedroom. Kelly told Nelson that he needed help moving the body. When Nelson asked what had happened, Kelly answered, "That's not important." Nelson testified that he never touched the body but, instead, quickly went downstairs, grabbed his plaid coat, and attempted to leave. Finding the back gate locked, however, Nelson asked Kelly to let him out. Kelly refused, the two men struggled,[16] and Nelson managed to grab the house keys from Kelly's pocket.[17]

With Kelly's keys Nelson opened the back door and started down the steps. Kelly charged after him with a kitchen knife, and the two began fighting in the garden.[18] Nelson took the knife from Kelly, cut him with it, and then ran down the alley. Kelly raced after him, trying to hit him with an umbrella which apparently had been in the garage. Nelson deflected Kelly's attack, kicking him in the face and knocking him to the ground. Kelly then started to run, this time with Nelson in pursuit. Nelson caught up with him behind the Nob Hill Restaurant, where they fought some more. Nelson then left and went to his apartment on Fairmont Street.

Nelson said that he "had never seen [Kelly] aggressive before." He admitted kicking Kelly in the face during the fight,

but he could not explain the gunshot wound to the back of Kelly's head.[19] He also denied owning a gun.

Shortly after arriving home, Nelson left his apartment to go to a friend's house. The police stopped him briefly on Sherman Avenue, released him, but then arrested him minutes later. Nelson was initially taken to Kelly's home on Lamont Street and then transported to police headquarters. Once at the station, and after having been advised of his rights, Nelson gave a statement to the police. He claimed, among other things, that he had been at a card game for most of the evening.[20] He admitted knowing Kelly, but denied having seen him or having been in or near his home at all that night. He said that he still had some property in Kelly's house but had not been back there to get it since he had moved out. Nelson claimed that he had driven a friend's car to the card game.[21] He told Detective Clark that he owned a red 1973 two-door Pinto, which was parked on First Street in front of his home, but that the car could not be driven because the battery had been stolen. He also stated that the blood on his socks and shoes had come from "dripping from both arms," but declined to say what had caused that "dripping."

At trial, Nelson admitted that he had lied in his statement to the police about having been at a card game. He also admitted lying about not having seen Kelly during that evening because he knew there was a dead man in Kelly's home and wanted the

16. Nelson admitted carrying a pen knife but denied ever using it or even pulling it out during his fight with Kelly.

17. On cross-examination Nelson said that Kelly had on a "ski-vest type coat" that he wore "kind of regularly." Nelson knew that the keys were in Kelly's right pocket because Kelly was right-handed and had a habit of placing his keys in that pocket.

18. Nelson said that he and Kelly never fought in the garage and could not explain how Kelly's keys got onto the ledge in the garage. Nelson claimed that he lost the keys somewhere in the garden during the struggle with Kelly.

19. Nelson explained that he could kick as high as Kelly's head because he had a "black belt." He denied having kicked Kelly in the back of

the head, but admitted that he "may have" hit him with the cinder block. Nelson said that Kelly "did not appear to be shot."

20. Nelson said he did not know when he left the card game because he was drunk at the time. He said that he was not drunk, however, when the police took him to the homicide office.

21. Nelson told the police that his friend's name was Timothy Frazier and that Mr. Frazier owned a red 1984 Nissan. At trial, however, Frazier testified that his car was a blue 1982 Dodge Challenger. Nelson defended his previous description of the car, claiming that they all "look the same to me."

police to stop questioning him. He admitted that the blood on his socks and shoes was not his own, that he had not driven Timothy Frazier's car, that his car was not broken down,[22] and that he had withheld from the police the fact that he had an apartment on Fairmont Street.[23] After Kelly called him, he said, he drove over to his Fairmont Street apartment from his First Street apartment in his own car. A friend, Francis Robinson, then drove the car back to First Street, and Nelson walked over to Kelly's Lamont Street home. Finally, Nelson admitted that he had been convicted in 1982 of armed robbery.

## II

At the close of the *voir dire*, defense counsel objected to the final composition of the jury, which at that point had been selected but not sworn. Relying upon *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), counsel claimed that the government had used its peremptory challenges to strike only black persons, leaving a jury not representative of Nelson's peers. The court disagreed with counsel's description of what happened and, because counsel had failed to raise the issue after each of the government's strikes, declined to entertain any argument on the subject.

On appeal Nelson reiterates his *Batson* argument, contending that the trial court erred in overruling his objection to the prosecutor's alleged misuse of his peremptory challenges by striking only black persons. The government argues in response that Nelson has not made even a *prima facie* showing of purposeful discrimination based on race. We reject Nelson's argument, not on the ground advanced by the government, but for the more fundamental reason that the record on appeal fails to establish the racial makeup of either the

venire or the jury actually selected, and that under *Cobb v. Standard Drug Co.*, 453 A.2d 110 (D.C.1982), the responsibility for that failure lies with appellant.

■ We held in *Cobb* that because the judgment of any trial court is presumed to be valid, a party who appeals from that judgment "bears the burden of convincing the appellate court that the trial court erred.... In meeting that burden, it is appellant's duty to present this court with a record sufficient to show affirmatively that error occurred." *Id.* at 111 (citations and internal quotation marks omitted). Appellant Nelson has not fulfilled that duty. The briefs of both parties contain representations about the composition of the jury. There are, however, significant discrepancies between those representations, and we cannot tell from the record which portrayal is accurate, or whether either one of them is.[24] We cannot, in any event, rely on the representations of counsel to fill gaps in the record. *Id.* at 111–112 (citing cases). Consequently, there is no basis on which we can even consider Nelson's claim of a *Batson* violation.

■ But even if we were to accept Nelson's description of the jury as correct, we would have to reject his argument. According to Nelson's brief, his trial counsel (who is not his counsel on appeal) used peremptory challenges to remove eight potential white jurors, including one alternate, as well as two black persons. This allegedly left three white and nineteen black venire members subject to challenge by one counsel or the other before the jury was finally chosen. Given this disparity in numbers, with black venire members outnumbering white ones by more than six to one, it is not particularly surprising that all of the persons struck by the prosecutor

---

**22.** Nelson said he was unsure why he had lied to the police about the working condition of his car, but stated that the "sticker on it ... was dead." He admitted, however, that he did not want the police to know he had a car.

**23.** Nelson acknowledged that he had sublet the Fairmont Street apartment from Timothy Frazi-

er and that he had moved into that apartment before the date of the murder.

**24.** Nelson alleges that the jury as finally chosen consisted of three black men, three white women, and six black women. The government's brief states that the jury included one black man, one white woman, and ten black women.

were (according to Nelson) black.[25] The most that might be said of the prosecutor's use of his peremptory challenges (as described by appellant) is that he might have had a preference for an older jury that was mostly female. Defense counsel's specific objection at trial was "that the jury that has been picked is basically one that excludes young black males," and that Nelson, a black male who was twenty-six years old at the time of trial, was being deprived of a jury of his peers. But of the ten persons struck by the prosecutor, only two, according to Nelson's brief, could be regarded as "young black males" (twenty-eight and thirty-three). Even if age or gender were an improper basis for a peremptory challenge—issues which we do not here decide—we would be hard-pressed to find a *Batson* violation in the striking of only two out of ten prospective jurors.

### III

When the trial resumed on the day after jury selection, but before the jury was actually sworn, defense counsel told the court that her client no longer wanted her as his attorney. Nelson himself addressed the court, claiming that his counsel was ineffective because of her alleged lack of sufficient experience to conduct the case and because she had failed to provide him with several requested items, particularly a transcript "of the case." The relevant discussion was as follows:

> [DEFENSE COUNSEL]: Your Honor, there's another preliminary matter. My client's just advised me that he does not want me as his attorney.
>
> THE COURT: He does not what?
>
> [DEFENSE COUNSEL]: Does not want me as his attorney.
>
> THE COURT: Well, that's just too daggum bad.
>
> You just tell me why you don't want her as your attorney. She's been your attorney for some months now. Stand up. Now, you tell me why you don't want [this woman] as your attorney.
>
> THE DEFENDANT: Your Honor, I don't feel that she's had enough experience to handle this case, and I requested several things over the last fifteen months, and some of the things are legal matters, and I didn't get the things until Friday.
>
> THE COURT: What?
>
> THE DEFENDANT: Such as the transcript, for one thing.
>
> THE COURT: Transcript of what?
>
> THE DEFENDANT: Of the case.
>
> THE COURT: What do you mean "of the case"? The case hasn't been tried.
>
> THE DEFENDANT: But there was information, Your Honor, in regard to the case, and I didn't have a copy of it until Friday.
>
> THE COURT: So, you had it since Friday.
>
> THE DEFENDANT: Well, I felt I should have had it a lot longer than Friday.
>
> THE COURT: Let me tell you, [your attorney] is a very competent attorney. She's with the Public Defender Service. They do an excellent job. She's not—I am not entertaining any motion, on the basis of what you just said, to have a new attorney.
>
> All right, that solves that one. Have a seat.

Citing this court's decision in *Monroe v. United States, supra,* Nelson now argues that the court's inquiry was inadequate to determine whether his pre-trial claim of ineffective assistance of counsel was meritorious or not. We agree.

In *Monroe* we held that when a defendant, before trial,[26] claims ineffective assistance of counsel based on counsel's lack of investigation, preparation, "or other substantial reason," a trial court must "conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." 389 A.2d at 820 (citations omitted); *accord, Farrell v. United States, su-*

---

25. In light of current population statistics, "[t]he prospect of an all-white or nearly all-white jury [in the District of Columbia] is, for all practical purposes, non-existent." *United States v. Cosby,* 115 Daily Wash.L.Rptr. 721, 724 (D.C.Super.Ct. February 18, 1987).

26. Because the jury had not been sworn and jeopardy had not yet attached, *Monroe* and *Farrell* were still applicable.

pra, 391 A.2d at 760–762. "The requirement of an 'inquiry' in such circumstances, which has come to be called a 'Monroe–Farrell hearing,' has been reaffirmed by this court on numerous occasions." *Bass v. United States,* 580 A.2d 669, 671 (D.C. 1990) (citations omitted). The extent and scope of the hearing will necessarily depend on the circumstances of each case, and for that reason the exact nature of the inquiry is within the trial court's discretion. Nevertheless, certain minimum procedures are required. As we said in *Monroe:*

> Whatever the exact contours of its investigation, the trial court must put to defense counsel (and to the defendant, if necessary)—*on the record*—specific questions designed to elicit whether or not the ... criteria of professional competence have been met. It then must make the requisite and appropriate findings of fact *of record* sufficient to permit meaningful appellate review on the issue of the ability and preparedness of counsel to render effective assistance under the prevailing circumstances.

389 A.2d at 821 (emphasis in original).

The trial court here did not adequately investigate Nelson's pre-trial claim that his counsel was too inexperienced to handle his case and that there had been insufficient communication between counsel and client. While we do not condone the tardiness of Nelson's request for new counsel, the court nevertheless had a duty under *Monroe* and *Farrell* to find out exactly what Nelson was complaining about, and then to elicit from counsel any information necessary to rebut or confirm Nelson's challenge. The abbreviated inquiry by the trial court established only that Nelson was dissatisfied with counsel's belated production of certain requested "information." The court's questions and Nelson's replies revealed nothing about the extent of defense counsel's preparation for trial or her communication with her client. The court deflected Nelson's complaint about counsel's lack of sufficient experience by remarking simply that counsel was "a very competent attorney" from the Public Defender Service, and then cutting off the discussion. Simply declaring that counsel was a competent attorney—which the trial transcript plainly shows she was—did not establish that she was capable of rendering adequate assistance *in this case. Monroe, supra,* 389 A.2d at 822. The court had an obligation to question defense counsel directly, on the record, about the specifics of Nelson's complaint before making its ruling.

We therefore remand this case for a *Monroe–Farrell* hearing. On remand the court must determine whether Nelson was represented at his trial by an attorney who was prepared "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970), quoted in *Monroe, supra,* as "the proper criterion by which pretrial claims of ineffective assistance of counsel are to be measured." 389 A.2d at 819 (footnote omitted). On that issue the government will have the burden of persuasion by clear and convincing evidence. *Bass v. United States, supra,* 580 A.2d at 671; *Matthews v. United States,* 459 A.2d 1063, 1066 (D.C.1983). Realistically, of course, we recognize that counsel's actual performance at trial will constitute circumstantial evidence on the issue of whether she was adequately prepared before trial. *See Bass, supra,* 580 A.2d at 672 n. 6. Nevertheless, placing on the government the burden of persuasion at the remand hearing "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979), cited with approval in *Matthews, supra,* 459 A.2d at 1066.

IV

The first count of the indictment charged Nelson with first-degree burglary while armed, in that he entered the dwelling of Leonard Kelly "with intent to steal property of another." The second count charged him with felony murder while armed, in that he killed Robert Nichols while perpetrating the crime of burglary while armed "as set forth in the first count of this

indictment...." Nelson now contends that the evidence was insufficient to convict him of burglary, and therefore insufficient as well to convict him of felony murder. His argument is essentially a challenge to the government's proof of his identity as the person whom Tami Battle saw entering the Kelly house shortly before midnight.

 The standard by which we assess claims of evidentiary insufficiency has been stated in hundreds of cases. We must view all the evidence in the light most favorable to the government, keeping in mind the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard. *United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C. 1978) (citing cases). We recognize no distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C.1978) (citing cases); *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). "It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Williams v. United States*, 357 A.2d 865, 867 (D.C.1976) (citations omitted). This test applies specifically to identification evidence, just as it does to any other kind of evidence. *In re B.E.W.*, 537 A.2d 206, 207 (D.C.1988) (citing cases).

 The evidence in this case showed, first of all, that when Nelson moved out of Kelly's house, he took with him a set of house keys. Tami Battle's testimony established that the man she saw entering Kelly's house did not have to force his way in; from that the jury could reasonably infer that this man let himself in with a key. Battle described him as wearing bib overalls, a rust-colored shirt or jacket, and a blue hat or cap. Ralph Smith testified that when he saw Nelson assaulting Kelly less than three hours later, Nelson was wearing bib overalls and an orange "top." Lynette Edwards likewise testified that the man she saw beating Kelly was wearing bib overalls and a rust-colored shirt. Kelly himself told the police that his assailant, whom he identified by name as Derrie Nelson, was wearing bib overalls, a red or orange shirt, and a dark knitted hat. Finally, expert testimony established that the blood on Nelson's socks could have come from either Kelly or Nichols (but not from Nelson himself, contrary to what he told the police), and—most tellingly—that a hair found on Nelson's coat matched that of Nichols, the decedent, and that hairs found on Nichols' clothing matched hair samples taken from Nelson.

We hold that a reasonable juror could find, from all of this evidence, that Nelson was the man whom Tami Battle saw entering Leonard Kelly's house. All four of these witnesses included in their descriptions the bib overalls and the red/rust/orange shirt or jacket, and two of the four, Kelly and Smith, identified Nelson by name. The exchange of hairs between Nelson and Nichols is entirely consistent with the sounds of a struggle that Tami and Troy Battle heard through their bedroom wall, a struggle that culminated in Nichols' death. At the very least, the evidence of Nelson's identity as the burglar,[27] and therefore as the murderer, was sufficient to go to the jury. *See Hill v. United States*, 541 A.2d 1285, 1287 (D.C.1988).

### V

After both sides had rested, defense counsel asked the court to include an instruction on second-degree murder in its charge to the jury. The court refused

---

27. The evidence relating to the burglary itself supports the government's theory that Nelson was the burglar. Kelly testified that one of the items missing after the burglary was a ring, which Nelson had seen while he was living in Kelly's house. Furthermore, although other parts of the house were in disarray, with drawers left open and various articles strewn about, the room that Nelson had occupied when he was living there was undisturbed. While obviously not conclusive, this fact, considered with all the other evidence, at least suggests that Nelson was the burglar.

counsel's request on the ground that the defense had not presented any evidence of second-degree murder. Nelson now contends that this ruling was error.

■■■■ A defendant is entitled, upon request, to a lesser included offense instruction "when (1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge." *Rease v. United States*, 403 A.2d 322, 328 (D.C.1979) (citations omitted). "[A]ny evidence, 'however weak,' will satisfy this requirement." *Id.* at 329 (citations omitted). Moreover, when counsel requests a lesser included offense instruction, "it should be freely given." *Wright v. United States*, 505 A.2d 470, 472 (D.C.1986) (citation omitted). The government does not contest that second-degree murder is a lesser included offense of felony murder.[28] It maintains, however, that there was no disputed factual element distinguishing the greater offense from the lesser,[29] and hence no evidentiary basis for a second-degree murder instruction. We cannot agree. We said in *Rease* that "even if there is no dispute about the facts tending to prove the element unique to the charged offense, the court should appraise all the testimony to see if it is capable of more than one reasonable inference." 403 A.2d at 329 (citations omitted). The trial court in this case erred in failing to make such an appraisal.

In *Waller v. United States*, 389 A.2d 801, 807 (D.C.1978), we said that felony murder has "two elements":

First, the defendant ... must have inflicted injury on the decedent from which he died. Second, the injury must have been inflicted in perpetration of a specified felony.

This is, of course, simply a shorthand way of saying that in addition to proving a causal relationship between an injury inflicted by the defendant and the death of the decedent, the government must prove all the elements of the underlying felony, whatever they may be. What that means in this case is that the government had to prove all the elements of first-degree burglary in order to convict Nelson of felony murder. The evidence that the jury heard, however, created a factual issue with respect to one element of the charged burglary, namely, Nelson's specific intent upon entering Kelly's house.[30] Because that issue was fairly raised by the evidence, the jury could reasonably have found that Nelson lacked the requisite intent, and therefore acquitted him of burglary. Without a guilty verdict on the underlying burglary charge, the jury could not have found Nelson guilty of felony murder, but it could have found him guilty of second-degree murder. The trial court should therefore have given an instruction on second-degree murder while armed as a lesser included offense of felony murder while armed.

■■■■ To commit burglary in the first degree, a person entering a dwelling must have already formed the intent to commit a criminal offense inside. *Shelton v. United States*, 505 A.2d 767, 769 (D.C.1986); *Massey v. United States*, 320 A.2d 296, 299 (D.C.1974). In this case the intent alleged in the indictment was an intent to steal property of another. From the evidence, however, the jury could reasonably have found (though it did not have to find) that Nelson entered the Kelly house simply to retrieve his own personal belongings,

28. This court's decision in *Towles v. United States*, 521 A.2d 651 (D.C.) (en banc), *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3236, 97 L.Ed.2d 741 (1987), reaffirmed the principle that second-degree murder is a lesser included offense of felony murder. An indictment for felony murder, we held, necessarily includes malice as an element of the offense and thus places the accused on notice that he is charged with the malice element of second-degree murder. *Id.* at 658 n. 14.

29. "[I]t is settled beyond dispute that a trial court should give a lesser included offense instruction, upon request, if 'proof of the greater offense will require the jury to find a disputed fact that need not be found to prove the lesser charge.'" *Simmons v. United States*, 554 A.2d 1167, 1170 (D.C.1989) (citations omitted).

30. We have already held in part IV of this opinion that the evidence was sufficient to prove that Nelson was the person who entered Kelly's house and shot Nichols.

which he had left there when he moved out in January. The jury knew that some of those belongings had already been removed and could have inferred that Nelson had taken them at a time when neither Kelly · nor Nichols was in the house, gaining entry by using the keys he still had. The jury also knew, from both Kelly's and Nelson's testimony, that Nelson had never met Nichols and did not know he was living in the house. From such a scenario the jury could have concluded that Nelson lacked the specific intent to steal at the time he entered the house, but that he was surprised by Nichols, got into an argument, and shot and killed him. That shooting, resulting in Nichols' death, would be second-degree murder.[31] Thus the government, even if it failed to prove the underlying burglary, could have obtained a second-degree murder conviction. *See Turner v. United States,* 459 A.2d 1054, 1057 (D.C. 1983). We therefore hold that the trial court erred in refusing to give an instruction on second-degree murder, as requested by defense counsel.

In the particular circumstances of this case, however, that error was harmless. In *Stewart v. United States,* 116 U.S.App. D.C. 411, 324 F.2d 443 (1963), the court held that a failure to instruct on unlawful entry as a lesser included offense of housebreaking (now known as burglary) was harmless because the jury also found the defendant guilty of larceny. In doing so, the jury necessarily found that when he entered the premises, the defendant had the requisite specific intent to steal which made his crime housebreaking rather than unlawful entry. *Stewart* is binding on us under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), and its rationale applies directly to this case. Following *Stewart,* we hold that the trial court's failure in this case to instruct on second-degree murder was

harmless error because the jury, by finding Nelson guilty of burglary, necessarily found that he had the requisite specific intent to steal when he entered Mr. Kelly's house. Since the only disputed element separating the greater offense (felony murder) from the lesser included offense (second-degree murder) was whether Nelson had a specific intent to steal,[32] and since a finding that Nelson had such an intent was inherent in the burglary verdict, the jury could not rationally have found Nelson guilty of the lesser offense. We therefore find no basis for reversal in the trial court's refusal to instruct the jury on second-degree murder while armed.[33]

## VI

Nelson presents several other arguments which we may discuss more briefly, for they are all without merit.

### A. *The statement*

Nelson contends that the trial court committed reversible error by admitting, through the testimony of Detective Clark, a statement which he gave to the police. Detective Clark read the entire statement into the record. The government argued, and the trial court agreed, that because the statement was replete with false inculpatory information, it was admissible as evidence of Nelson's consciousness of guilt.

The law is clear in this and other jurisdictions that a false statement made by a defendant in explanation of conduct which is the subject of criminal charges against him is admissible as tending to show consciousness of guilt. *Fornah v. United States,* 460 A.2d 556, 561 (D.C. 1983); *Fox v. United States,* 421 A.2d 9, 13 (D.C.1980); *Beck v. United States,* 78 U.S.App. D.C. 10, 11, 140 F.2d 169, 170 (1943); *see Wilson v. United States,* 162

---

**31.** Malice, an element of both first- and second-degree murder, may be inferred from the use of a dangerous weapon, such as a gun. *Curry v. United States,* 322 A.2d 268, 269 (D.C.1974).

**32.** Given the state of the evidence, Nelson does not assert, nor could we find, any dispute over the "while armed" element of any of the charged offenses.

**33.** Nelson also argues that his first-degree burglary conviction merged with his conviction of felony murder based on that burglary and must therefore be vacated. The government agrees, and so do we. *See Whalen v. United States,* 445 U.S. 684, 693–694, 100 S.Ct. 1432, 1438–1439, 63 L.Ed.2d 715 (1980).

U.S. 613, 620–621, 16 S.Ct. 895, 898–899, 40 L.Ed. 1090 (1896). "The falsity of the exculpatory statements, which provides the inference of consciousness of guilt, typically is proven by independent direct evidence, not by defendant's subsequent admissions." *Fox, supra,* 421 A.2d at 13 (citation omitted).

Through the testimony of several witnesses, the government exposed the prevarication in Nelson's statement to the police. The evidence established, contrary to Nelson's statement, that the blood on his socks and shoes was not his own, that his car was not parked outside the First Street apartment on the evening of February 12, and that he had indeed gone to Kelly's home that same evening and had, at the very least, touched Nichols' body (as shown by the exchange of hairs). Nearly all of the plausibly disputable information contained in Nelson's statement was discredited by government witnesses. The trial court did not err in concluding that the statement evinced Nelson's consciousness of guilt at the time of his arrest and was therefore admissible during the government's case in chief.

### B. *The tape recording*

Nelson also claims error in the trial court's admission of a tape recording of Kelly's emotional outburst when he first heard the news of Nichols' death. During cross-examination defense counsel directed accusatory questions at Kelly, suggesting that he had murdered Nichols and then tried to pin the blame on Nelson. On redirect examination the prosecutor asked Kelly when he had first learned of Nichols' death and whether a recording of his reaction had been made. The government then called Sergeant Ernest Barlow of the Metropolitan Police, who had recorded Kelly's response at the hospital, to lay a foundation for the tape. After listening to Barlow's testimony, the court admitted those sections of the tape revealing Kelly's shocked reaction. Defense counsel immediately requested that additional segments, allegedly showing the speed of Kelly's recovery from his emotional distress, also be played. The court granted counsel leave to play whatever portions of the tape she wished.

 Defense counsel's cross-examination of Kelly injected Kelly's state of mind into the inventory of disputed issues. By implying that Kelly was the actual murderer, counsel opened the door to proof of Kelly's shock and distress when he first heard that Nichols had been killed, which would tend to show that Kelly was not the murderer. The law is clear that when a declarant's state of mind is at issue, extrajudicial statements which reveal that state of mind are admissible. *Giles v. United States,* 432 A.2d 739, 745 (D.C.1981); *Clark v. United States,* 412 A.2d 21, 25 (D.C. 1980); *Gezmu v. United States,* 375 A.2d 520, 522 (D.C.1977). The special confidence granted to statements of present state of mind rests, as in the case of statements of present bodily condition, upon their spontaneity and probable sincerity. *See* 6 J. WIGMORE, EVIDENCE § 1714 (Chadbourn rev. 1976). The decision whether to admit such evidence is committed to the sound discretion of the trial court, which must balance its probative value against the dangers of prejudice, confusion, and delay. *Hairston v. United States,* 500 A.2d 994, 998 (D.C. 1985); *Kleinbart v. United States,* 426 A.2d 343, 359 (D.C.1981); *Jones v. United States,* 398 A.2d 11, 13 (D.C.1979).

The tape recording in this case was simply a record of Kelly's emotional response to the news of Nichols' death. Kelly testified that he first heard that news from Sergeant Barlow at the time the recording was made. Defense counsel, however, sought on cross-examination to bolster the defense claim that Kelly was responsible for Nichols' murder. Thus Kelly's state of mind, both at the scene shortly after the murder and later at the hospital when he was told of Nichols' death, was placed in issue. Additionally, defense counsel was given an opportunity to discredit Kelly's outburst by playing additional segments of the tape. The jury was then left to consider the truth of Kelly's statements and the genuineness of his grief. We hold that the tape recording was admissible for whatever weight the jury may have seen fit to give

it. *See Harrison v. United States*, 526 A.2d 1377, 1379 (D.C.1987).[34]

### C. *The knife*

■ Nelson contends that the knife seized from him was not admissible because the connection between the knife and the assault on Kelly was too tenuous, in that Kelly could not identify the knife beyond the fact that it had a silver blade. This contention is without merit.

Nelson was arrested approximately four blocks from the scene of the murder and assault. Kelly's face had been sliced and his ear nearly severed by a knife wielded by Nelson. The knife recovered from Nelson bore traces of blood, although not sufficient in amount for the serologist to determine whether the blood was human. All of these elements, in combination, support the inference that the knife found on Nelson was the same one used in the attack on Kelly. The knife was clearly capable of "affording a reasonable inference as to a matter in dispute" and had "some connection with the defendant or the crime with which he [was] charged...." *Burleson v. United States*, 306 A.2d 659, 661 (D.C. 1973). Kelly's inability to identify the knife precisely affected only its evidentiary weight, not its admissibility. *Id.; see Lee v. United States*, 471 A.2d 683, 685 (D.C. 1984) (victim's description of knife used in assault not fully consistent with knife recovered from defendant's car; admission of knife nevertheless upheld); *cf. United States v. Thornton*, 149 U.S.App. D.C. 203, 205, 462 F.2d 307, 309 (1972) (victim was unable to identify electric razor as stolen property, "but he did identify the razor and case as being of the same make and type as the one that had been stolen from him"). We hold that the trial court did not abuse its discretion by admitting the knife.

### D. *The prosecutor's comments*

■ Nelson claims that certain remarks made by the prosecutor during his closing argument were so prejudicial as to deny him a fair trial. We are satisfied that the

challenged comments, read in context, do not call for reversal.

Defense counsel ended her summation as follows:

[W]e want you to spend some time and consider all that has been presented before you, because once I sit down and once the government has sat down, and the court has instructed you on the law, you have made your decision, you can't come back.

You can't come back and say, "Now I have a reasonable doubt." You can't call any of us and say that the knife that the Government introduced is not red and doesn't seem to fit the circumstances. You can't call back and say that the physical evidence fits just as much what Mr. Nelson said as it does with what Mr. Kelly said. You can't. Your decision is final.

The prosecutor, in rebuttal, countered defense counsel's appeal with the following:

Defense counsel says that you can't call back and say you're sorry if you make a mistake and convict somebody erroneously. The easy and the flip side to that argument is you can't call back to Mr. Kelly and say, "Well, I'm sorry, we acquitted somebody. You had better lock your doors." But you know that's the easy answer. It's also the cheap answer, because that answer is designed to scare you, just like the defense argument about calling back is designed to scare you.

It is designed to scare you away from trusting your own judgment.

At this point defense counsel objected, but she failed to state the grounds for her objection and did not pursue it. The prosecutor then resumed his argument:

It is an argument designed to make you decide the case on fear and emotion. And you don't need to do that, ladies and gentlemen.

Nelson now contends that these comments, especially the part about "lock[ing] your doors," were improper because they were

34. Kelly's reaction to the news of Nichols' death was also admissible as a spontaneous or excited

utterance. *See Nicholson v. United States*, 368 A.2d 561, 564 (D.C.1977).

designed to arouse the fear and passions of the jury.

We need not decide whether the limited objection by defense counsel was sufficient to preserve this issue for appellate review. *See McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). Even if we assume that it was, we cannot discern on this record the "substantial prejudice" which we must find in order to reverse. *See Williams v. United States,* 483 A.2d 292, 297 (D.C.1984), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). It is obvious that the prosecutor was responding to the argument just made by his opponent; indeed, the prosecutor explicitly told the jury that his comment was "the flip side" of what defense counsel had said a few moments earlier. "In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) (citations omitted). In any event, we are not particularly troubled by either comment, and we certainly do not find the prosecutor's remark to be so inflammatory as to warrant reversal. We also note that the prosecutor himself promptly—and correctly—reminded the jurors that they should trust their own judgment, and not be swayed by "easy answer[s] ... designed to scare you." There was nothing else in his argument that would raise a judicial eyebrow or otherwise taint the jury's verdict. Viewing the record as a whole, and taking into account the strength of the government's case, *Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), we can find no substantial prejudice flowing from the prosecutor's comment.

### E. *The kidnapping conviction*

The last of Nelson's arguments focuses on his conviction of kidnapping while armed. Citing *Vines v. United States,* 540 A.2d 1107 (D.C.1988), he claims that the alleged kidnapping was "momentary and coextensive in time and place with the underlying crime" of assault with intent to kill. *Id.* at 1108. He argues that because the kidnapping was an integral part of the assault, the two crimes merge, and his conviction of kidnapping must be vacated. We disagree.

When a kidnapping charge is joined with other charges, the key inquiry is whether the seizure or asportation of the victim was merely incidental to another crime, and thus an integral part of it, or whether the confinement and restraint were significant enough in themselves to warrant an independent prosecution for kidnapping. *Robinson v. United States,* 388 A.2d 1210, 1211–1212 (D.C.1978); *Sinclair v. United States,* 388 A.2d 1201, 1207–1208 (D.C.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979). The answer to this question may depend on whether the kidnapping substantially increased the risk of harm to the victim beyond that inherent in the underlying crime. *Catlett v. United States,* 545 A.2d 1202, 1216 (D.C.1988), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989); *accord, West v. United States,* 599 A.2d 788, 793 (D.C.1991). If the seizure or asportation of the victim places that victim in greater danger or makes it more likely that the perpetrator will succeed in the underlying crime and not be apprehended, the kidnapping and the underlying crime do not merge. *Vines v. United States, supra,* 540 A.2d at 1108.

In the present case, the kidnapping was not merely an incident of the assault with intent to kill. Nelson initially tried to kill Kelly by shooting him in the back of the head while they were still in the house. Having failed in this attempt, Nelson seized Kelly's keys and forced him out to the garage, then opened the trunk of Kelly's car and demanded that Kelly climb in. Thus the assault ended before the kidnapping even began. *See Owens v. United States,* 497 A.2d 1086, 1096–1097 (D.C. 1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). Moreover, getting into the trunk would have increased the danger to Kelly, while at the same time lessening the likelihood of Nelson's capture (by transporting Kelly out of sight of the eventual witnesses). *See Catlett, supra,*

545 A.2d at 1216; *Beck v. United States*, 402 A.2d 418, 423 (D.C.1979); *Sinclair, supra*, 388 A.2d at 1207. On the facts of this case, forcibly removing Kelly from the house was clearly not an integral part of Nelson's assault with intent to kill. We therefore hold that there was no merger.[35]

### VII

To sum up, we vacate Nelson's conviction of first-degree burglary because it merges with his conviction of felony murder while armed; see note 33, *supra*. Having done so, we remand this case to the trial court for a *Monroe–Farrell* hearing. If the court concludes, after that hearing, that Nelson's Sixth Amendment right to the effective assistance of counsel was violated, it shall vacate the entire judgment of conviction and order a new trial. If the court finds no Sixth Amendment violation, then the judgment of conviction shall stand affirmed. We reject all of Nelson's other claims of error.

*Vacated in part and remanded.*

---

**35.** Nelson's merger argument fares no better under the traditional *Blockburger* test. *See Monroe v. United States*, 600 A.2d 98, 99 (D.C. 1991), citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).